**IN THE COURT OF APPEALS OF IOWA**

No. 14-0081
Filed March 12, 2014

**IN THE INTEREST OF J.K.G.,**
       **Minor Child,**

**J.R., Mother,**
       Appellant,

**R.A., Father,**
       Appellant.
_____

       Appeal from the Iowa District Court for Carroll County, Adria Kester, District Associate Judge.

       A mother and father separately appeal the termination of their parental rights to their special-needs daughter. **AFFIRMED ON BOTH APPEALS.**

       Robert E. Peterson, Carroll, for appellant-mother.

       Mark J. Rasmussen, Jefferson, for appellant-father.

       Thomas J. Miller, Attorney General, Kathrine S. Miller-Todd, Assistant Attorney General, John C. Werden, County Attorney, and Erik Howe, Assistant County Attorney, for appellee.

       Martha Sibbel of Law Offices of Martha Sibbel, P.L.C., Carroll, attorney and guardian ad litem for minor child.

       Considered by Vogel, P.J., and Tabor and McDonald, JJ.

**TABOR, J.**

J.K.G. is a child with special needs related to low birth weight and early hospitalization for failure to thrive. J.K.G. is now almost two years old and suffers developmental delays and difficulty with muscle development and vision. The question in this appeal is whether either of the parents is able to offer the full-time, specialized care J.K.G. will require to reach her full potential, including nutritional, optical and physical therapies.

The juvenile court decided neither parent could muster the "exceptional parenting skills" required to meet J.K.G.'s needs and found it in her best interests to terminate their parental rights. In separate appeals, both the mother, Joni, and the father, Ricardo, contend the State failed to present clear and convincing evidence for termination of their rights under Iowa Code section 232.116(1)(h)(4) (2013). They also argue severing ties is not in the child's best interests, given their strong bonds with J.K.G. *See* Iowa Code §§ 232.116(2), (3). We admire the sincere desire to reunite with J.K.G. shown by both Joni and Ricardo, but ultimately we see the realities of raising J.K.G. to be too demanding for even the best efforts of her natural parents.

J.K.G. was born in April 2012, weighing only four pounds, thirteen ounces. She was hospitalized twice in her first ten weeks for malnutrition, dehydration, and failure to thrive. J.K.G.'s mother, Joni, has learning disabilities and required

remedial instruction in the proper care and feeding of the baby during the hospital stays.[1]

J.K.G. weighed seven pounds, fourteen ounces when released on July 5, 2012. During the next five days in her mother's care, J.K.G. lost eight ounces. The baby's skin took on a grey color, and she had little muscle tone, leaving her unable to lift her head or control her arm and legs. Medical professionals viewed the baby's condition as life threatening. The Department of Human Services (DHS) sought and received an emergency removal order on July 11, 2012. The baby began to gain weight immediately in her foster care placement.

The juvenile court adjudicated J.K.G. as a child in need of assistance (CINA) on August 22, 2012. The court ordered a mental health evaluation for Joni and paternity testing for Ricardo, whom Joni identified as the child's father. Testing confirmed Ricardo was J.K.G.'s father. Joni and Ricardo could not get along, so the DHS provided supervised visitation sessions, separately for each parent, several times per week. J.K.G. required physical therapy to increase her strength and muscle development and the parents were encouraged to help her with her exercises during the visits.

In November 2012, Joni underwent a psychosocial evaluation and parenting skills assessment. She was diagnosed with posttraumatic stress disorder, as well as chronic and borderline intellectual functioning, with an IQ

---

[1] During this time, Joni was living with James, who was not the baby's father. Joni told DHS workers that James was physically and verbally abusive to her during and after the pregnancy.

score of 71, placing her in the borderline range.[2] The report indicated Joni was a "concrete learner" who could follow immediate instructions, but was unable to adapt her actions independently based on changing circumstances. This assessment drew concerns about Joni's ability to react appropriately to unforeseen changes in her daughter's medical condition and development. Joni participated in nearly two hundred hours of parenting education and instruction arranged by the DHS. She was able to implement suggestions made by the trainers, but without prompting or directions, she was unable to respond to J.K.G.'s evolving needs. Most troubling, Joni did not follow through with the physical therapy exercises J.K.G. required to achieve muscle tone.

Ricardo also received parenting instructions during his visits with J.K.G. Ricardo is a native Spanish speaker, but despite the language barrier, he was able to learn from the service providers and grew more comfortable with taking care of his daughter. But Ricardo continued to rely heavily on the service providers for direction.

The State filed a petition on March 4, 2013, seeking termination of the rights of both parents. The juvenile court held a termination hearing on May 31, 2013, and granted the parents six additional months to reunify with their daughter. The court imposed the following three expectations for the parents during those six months: (1) develop parenting skills to care for a child with

---

[2] Joni has lived on her own for seven years, working part time and receiving Supplemental Security Income (SSI) disability benefits, with her step-mother as the payee.

special needs, (2) demonstrate the ability and willingness to co-parent the child, and (3) maintain stable mental health.

The juvenile court received a parenting assessment for Ricardo completed in November 2013. The licensed social worker who performed the assessment noted that, like Joni, Ricardo seemed to have below average intelligence. The assessment opined: "IQ does make a difference with special needs children like [J.K.G.] at times." By the time of the assessment, Ricardo had been having unsupervised visits with J.K.G. for about six weeks. The assessment recognized many positive traits in Ricardo. For example, Ricardo had a stable employment history and a strong support system from his brother, his sister-in-law and her extended family with whom he resided. He did not have substance abuse issues or any recent criminal offenses.

The juvenile court held a second termination hearing on December 5, 2013. The Family Safety, Risk and Permanency (FSRP) worker testified both parents exhibited a lot of love for J.K.G., but were not able to meet her special needs, even after hundreds of hours of parenting assistance. The FSRP worker found safety issues at Joni's apartment, including mounting clutter, unsanitary practices, and placement of a Scentsy lamp containing hot wax within the toddler's reach. For his part, the worker believed Ricardo was surprised by J.K.G.'s increasing mobility. He did not engage in the level of physical interaction with his daughter the service providers expected. Moreover, his supervision was sometimes lax. During one visit, the child took an accidental tumble on stairs at

his home resulting in a bump on her head and requiring a trip to the emergency room.

The DHS case supervisor learned from the physical therapist that J.K.G. was starting to regress in her muscle tone as she spent more time in the care of her parents. The worker opined: "given her fragile state as far as her development, that was very concerning to me." The evidence also revealed the parents did not communicate effectively with each other—both declining to share information in a journal exchanged during visitations. The DHS worker testified J.K.G. was adoptable, though a pre-adoptive family had not yet been identified.

J.K.G.'s guardian ad litem (GAL) asked the court to terminate parental rights, noting: "we have parents with learning disabilities, we have a child with special needs." The GAL believed the parents would not be able to meet the developmental needs of their daughter and that she faced "probable harm" if returned to their custody.

Relying on Iowa Code section 232.116(1)(h), the juvenile court terminated the rights of both parents in an order filed January 3, 2014. Joni and Ricardo filed separate petitions on appeal.

## I. Standard of Review

We review the order terminating parental rights de novo. *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010). We give serious consideration to the district court's factual findings and credibility determinations, but we are free to reach our own conclusion when deciding if termination was proper. *Id.*

We will uphold an order if the evidence in support of termination is "clear and convincing," which is defined as the absence of any "serious or substantial doubts" as to its correctness or to the conclusions drawn from it. *Id.*

## II. Statutory Grounds

The juvenile court based its decision on section 232.116(1)(h). Under that provision, the court may terminate the rights of a parent to a child if: (1) the child is three years old or younger, (2) the child has been adjudicated a CINA under section 232.96, (3) the child has been out of the parents' custody for at least six of the last twelve months or the last six consecutive months, and (4) "[t]here is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time." Iowa Code § 232.116(1)(h).

Neither parent disputes the first three elements were met. J.K.G. was about twenty months old, had been adjudicated CINA in August 2012, and had been in foster care for almost seventeen months by the time of the December 2013 termination hearing. The point of contention is the fourth element. Both parents in their petitions on appeal disagree with the juvenile court's finding that J.K.G. could not be presently returned to their custody. *See* Iowa Code § 232.116(1)(h)(4). They do not elaborate on their positions.

The case for termination is not overwhelming in regard to either Joni or Ricardo. The record "does not present any of the usual precursors to termination of parental rights, such as physical or emotional abuse of the child, substance abuse by one or both parents, domestic abuse, parental criminal conduct, or

even overt neglect." *See In re A.M.*, ___ N.W.2d ___, ___, 2014 WL 685401 at *10 (Iowa 2014). Likewise, all agree these parents care deeply for J.K.G. and have made some progress in feeding and comforting her. *See id.*

On the other hand, the record shows after more than one year of services, neither Joni nor Ricardo can meet J.K.G.'s special needs without the continued involvement of DHS workers. The FSRP worker, the DHS case manager and the GAL all recommended termination. *See D.W.*, 791 N.W.2d at 707 (noting service providers and GAL were unable to advocate for reunification). We give considerable weight to their recommendations.

The parents' lower mental functioning, standing alone, cannot be the reason for terminating their rights to a child. *See In re D.W.*, 791 N.W.2d at 708. But parents' intellectual limits are relevant considerations when they affect the child's well-being. *See id.* Those considerations loom large in this case due to J.K.G's health and developmental challenges.

J.K.G.'s medical condition requires ongoing visits to her pediatrician, gastroenterologist, ophthalmologist, and geneticist. She needs intensive physical therapy, nutritional monitoring, and attention to her developmental delays. We agree with the juvenile court's determination that her vulnerabilities demand a level of exceptional parenting, which Joni and Ricardo have not shown themselves capable of providing.

While Joni's parents and members of Ricardo's extended household offered their assistance in the care of J.K.G., the service providers did not see that commitment in action. During the child's visits to their respective homes,

Joni and Ricardo have shouldered the responsibility of their daughter's care without much involvement from other caregivers. Joni's father and stepmother visited her infrequently, and the other adults in Ricardo's home were busy with their own jobs and children. Moreover, Joni and Ricardo did not meet the juvenile court's expectation that they develop a constructive dialogue between them regarding the child's care.

The juvenile court allowed these parents additional time to see if they could acquire the skills necessary to care for their special-needs daughter. But time could not remedy their parenting deficiencies. The parents did not focus on her physical therapy exercises, and her muscle development regressed as she spent more time in their care. We agree with the juvenile court's conclusion J.K.G. could not be safely placed in the custody of Joni or Ricardo. The child's immediate and long-term nurturing and growth will require caregivers better able to respond to her precarious medical conditions.

## III. Best Interests

Both Joni and Ricardo contend termination of their rights is not in J.K.G.'s best interests, citing Iowa Code sections 232.116(2) and (3). Both claim an emotional bond with their daughter should preclude severing their legal ties.

"[T]here is no all-encompassing best-interest standard to override the express terms of the statutory language." *In re P.L.,* 778 N.W.2d 33, 40 (Iowa 2010). If a ground for termination exists under section 232.116(1), we turn to the factors in section 232.116(2) to decide if, under that framework, termination serves the child's best interests. Subsection (2) directs our primary consideration

to the child's safety; her long-term nurturing and growth; and her physical, mental, and emotional needs. Iowa Code § 232.116(2).

Finally, we must decide if any circumstances cited in subsection (3) tip the balance away from termination. At issue here is section 232.116(3)(c), which allows the court to forego termination if clear and convincing evidence exists that termination would be detrimental to the child due to the closeness of the parent-child relationship.

The service providers testified J.K.G. recognizes and responds to her mother and is comfortable with her father when visiting his home. But the record does not reveal clear and convincing evidence termination would be harmful to J.K.G. because she shares such a tight bond with her mother or her father. *See P.L.*, 778 N.W.2d at 41.

In J.K.G.'s situation, the utmost concern is her fragile health. The inability of her natural parents to respond to her unpredictable needs, without prompting, supports the juvenile court's conclusion that freeing her up for adoption was in the child's best interests. The DHS case manager was optimistic about finding capable parents willing to adopt J.K.G. Sections 232.116(2) and (3) do not stand in the way of termination.

## IV. Reasonable Efforts

Both parents allege the DHS failed to make reasonable efforts to allow reunification with J.K.G. They claim that during the six-month extension granted by the juvenile court, the DHS did not provide adequate services. But the parents do not specify on appeal what additional services would have enabled

them to reunite with J.K.G. nor do they allege they asked DHS for help they didn't receive.

The juvenile code requires the DHS to make "every reasonable effort to return the child to child's home as quickly as possible consistent with the best interests of the child." Iowa Code § 232.102(7); *In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000). What constitutes reasonable services varies depending on the requirements of the individual case. *In re C.H.*, 652 N.W.2d 144, 147 (Iowa 2002). When a parent fails to identify a deficiency in services or to ask for additional services, he or she may be precluded from later challenging the adequacy of the services. *Id*. at 147 n.4.

After the juvenile court gave the parents an extension of six months, the DHS arranged for more semi-supervised and unsupervised visitation with both the mother and the father. The DHS estimated Joni and Ricardo each received more than two-hundred hours of instruction in parenting skills from FSRP workers and other agencies. The parents' shortcomings cannot be blamed on a lack of reasonable efforts by the DHS.

Our de novo review of the record leads us to the same conclusion as the juvenile court: "Neither parent has demonstrated they can provide constant, responsible, and reliable care to [J.K.G.] in the statutory time frame allowed to them. Despite numerous services, showing 'some' improvement in parenting is just not enough." Accordingly, we affirm the order terminating the rights of both parents.

**AFFIRMED ON BOTH APPEALS.**